COOKS, J.,
dissenting.
hi respectfully dissent from the majority opinion, finding merit in Defendant’s assignment of error that the time limitations to commence trial expired in this case. Therefore, I believe Defendant’s conviction must be reversed and his sentence vacated.
The majority relies on State v. Romar, 07-2140 (La.7/1/08), 985 So.2d 722, contending Defendant received actual notice of the trial date, thus, the State was relieved of its duty to locate him for trial. However, in my examination of the record. I do not find that Defendant received actual notice of the trial date. The court in Romar stated as follows:
As a general matter, the state has two years from the institution of prosecution to begin trial of a non-capital felony. La.C.Cr.P. art. 578(A)(2). The statutory periods of limitation “enforce the accused’s right to a speedy trial and ... prevent the oppression caused by suspending criminal prosecutions over citizens for indefinite periods of time.” State v. Rome, 93-1221 (La.1/14/94), 630 So.2d 1284, 1286; see United States v. Marion, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971)(statutes imposing time limits on trial “provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant’s right to a fair trial would be prejudiced.”). That period may be enlarged as the result of suspension, La.C.Cr.P. art. 580, or interruption, La.C.Cr.P. art. 579, but in either case, the state “bears the heavy burden of showing that it is excused from trying the accused on a charge later than the period mandated by [La. C.Cr.P. art.] 578.” State v. Chadbourne, 98-1998, p. 1 (La.1/8/99), 728 So.2d 832 (internal quotation marks and citations omitted). That | ¡>burden ordinarily “ ‘requires the State to exercise due diligence in discovering the whereabouts of the defendant as well as taking appropriate steps to secure his presence for trial once it has found him.’ ” State v. Bobo, 03-2362, p. 5 (La.4/30/04), 872 So.2d 1052, 1055-56 (quoting Chadbourne ).
We agree with the First and Third Circuits that La.C.Cr.P. art. 579(A)(3) does not impose on the state the affirmative duty to search for a defendant who has failed to appear for trial after receiving actual notice. The 1984 amendment of La.C.Cr.P. art. 579 made *980 a defendant’s contumacious failure to appear for trial after receiving notice, a direct contempt of court, La.C.Cr.P. art. 21(A)(1), a ground of interruption of the time limits in La.C.Cr.P. art. 578 for bringing him to trial, without regard to whether he thereby intended to avoid prosecution altogether by rendering himself a fugitive from justice, or whether he had otherwise placed himself beyond the control of the state to secure his presence for trial.
Id. at 725-26. (emphasis added).
Romar indicates that actual notice, not issuance of a bench warrant, is the mechanism that relieves the State of the obligation to locate a defendant. In the present case, the record does not prove Defendant received actual notice of the relevant court dates. The minutes of his September 2003 arraignment do not show he received notice, and there is no transcript of that proceeding in the record. However, the district court clerk’s office has provided a supplemental record containing a court summons issued on the same date. The caption bears Defendant’s name and the trial docket number, 98483. The summons includes a pretrial date, October 30, 2003, and the trial date, December 1, 2003. Although there is a signature, it is illegible and does not appear to match the equally illegible signature on his appearance bond.
During the hearing on Defendant’s motion to quash, the presiding judge made the following observations:
THE COURT: Mr. Wilks, this is a rather confusing situation, but, Mr. Wilks, as best I can determine you were arrested back in 2003, apparently, as you describe it, for theft of a wallet. And I do have — and on that date that you were arrested you used the name Frank Wilks. And |sso that’s how the case was initially filed, charging a person named Frank Wilks with having committed this crime of theft.
Then you came to an arraignment and then you evidently pled not guilty and it was scheduled for a pretrial conference, and on one of those dates that you were scheduled for a pretrial conference that happened to be September 18, 2003.
On that day you apparently spoke with the lawyer who had been appointed to represent you, his name was Lee Gillespie. He’s a large fellow. You remember him? He, apparently, after speaking with you, learned of your real name, that you were, in fact, Milton Anthony Wilks. I assume that he must have had some representation with you previously or a person who was arrested with you on a previous occasion because he reported that he had a conflict of interest and he could not represent you in that case. Do you remember that?
MR. WILKS:
A. Yes, yes.
MR. GUIDRY: Judge, for the record, if we could supplement it, what it indicates is that Mr. Gillespie was familiar with the victim.
THE COURT: Familiar with the victim. So, therefore, Mr. Gillespie had to get out of the case. And another lawyer was appointed to represent you, his name was Kirk Piccione. Mr. Piccione, since he was new to the case, asked for the trial to be continued. So the trial was continued. Evidently, you and Mr. Piccione had a relationship talking about the ease, preparing the case. But then on that date in December, the 1st of December 2003, you did not come to court and so, therefore, a bench warrant was issued. So that means that you were free on bond at that time when you saw me.
MR. WILKS:
*981 A. No.
THE COURT: You weren’t?
MR. WILKS:
A. Never. I was incarcerated. I was in Lafayette Parish jail.
THE COURT: So then there is the mystery of what the date was that you pled guilty to whatever charges in city court that let you get out of jail.
MR. WILKS:
|4A. That was in, like, April or something, April or May. The deputy there released me. The deputy over there, she released me.
THE COURT: April of 2003, May of 2003, but you see, you still had a court date with me in December of 2003. And so you apparently got out of jail.
MR. WILKS:
A. I never got out of jail. I stayed in jail the whole time until April or May.
THE COURT: Right. April or May you pled guilty to some charges, you have no idea what those charges were.
MR. WILKS:
A. Yes, it was from the indictment. It wasn’t an indictment.
THE COURT: I just asked you when you were on the stand if you could tell me all of the things you pled guilty to. You couldn’t. So you don’t know.
MR. WILKS:
A. I don’t know all of them.
THE COURT: I know you don’t know. Listen to me. You don’t know, that’s what I’m telling you, you don’t know what you pled guilty to.
MR. WILKS:
A. No.
THE COURT: Therefore, listen. Therefore, listen. You don’t know what you pled guilty to. And so, therefore, you got out of jail. You have no idea whether or not you pled guilty to this charge of theft of a wallet that you were arrested for. Okay? When you got out of jail you were happy to be out of jail. You didn’t come to the courthouse here to make sure that what you thought was the case in city court, that everything was gone, everything was finished, everything was resolved, you pled guilty to everything, when you thought that you were free you could’ve come here to this building, the clerk’s office.
MR. WILKS:
A. I had no idea.
THE COURT: I know you didn’t have any idea. You could have Rif you wanted to have an idea.
MR. WILKS:
A. Because it was my understanding—
THE COURT: Stop speaking. Stop speaking. You had a bad understanding. Would you like to have a good understanding?
A. Yes, sir.
THE COURT: That’s what I’m trying to give you. In order to receive a good understanding you have to listen and stop speaking and start listening. You left city court happy, thought that everything was resolved. Unfortunately, it seems that you were mistaken. You could have found out your mistake. You could have confirmed that what you thought was truthful was truthful if you had only walked across the street from the jail to this courthouse, come to the clerk’s office, checked your file to make sure — those people over there in city court, they told me everything was finished. I need to be sure that everything is finished. Can you tell me that everything is finished? You didn’t do that. You were just happy, you left.
As it turns out everything wasn’t finished. We were expecting to see you in *982 December. You did not come in December. You were free. Therefore, I issued a warrant. You weren’t in jail when I issued the warrant, you were free because you got out in April or May, according to you. So you were free. Then, apparently, before you were even arrested for this charge you had been in other states, Florida one of them. After you left — after you were free in April or May of 2003 you traveled to other states.
MR. WILKS:
A. Never Florida. I’ve never been in Florida.
THE COURT: You’re speaking again. You can’t learn if you speak. And so you traveled to other states. Many other places you visited: sometimes you visited friends, sometimes you just enjoyed life being in other places; but all of that time there was a warrant out for your arrest. At some point you got arrested in Texas for a parole violation and you had to serve two months. You served the two months, you were free. You got out, enjoyed life, traveled hither and yon, went to various places, did various things, had a good time.
Then you came to Lafayette and, unfortunately, some police officer happened to find out that there was a warrant for your arrest at a time when you were in that officer’s presence. He arrested you, brought you to jail. That is apparently what happened. Unfortunately, that means, the motion to quash is denied. Good luck to you, sir.
|fiThe judge made reference to a pretrial conference date of September 18, 2003, the appointment of attorney Lee “Gillespie,” that attorney’s withdrawal, the subsequent appointment of attorney Kirk Piccione, and a continuance filed by Piccione. However, the record does not document all of these events.
On September 15, 2003, the local Public Defender’s Office filed a letter revoking the appointment of Eric Neumann as Defendant’s counsel, and appointing Lee Gal-laspy. A supplemental record provided by the district court clerk’s office shows that Lee Gallaspy’s appointment was revoked in October 2003, and Randy Lasseigne was appointed. In February 2008, Lasseigne’s appointment was revoked, and Burton Gui-dry was appointed. By affidavit, the deputy clerk of court states the record does not contain any documents reflecting that Pic-cione was appointed as Defense counsel, and does not contain any pleadings filed by Piccione.
At the hearing, Defendant took the stand and denied he received notice of the specific dates he was to appear in court, but acknowledged being aware of the charge. Defendant testified he thought he had pled guilty to the charge at issue, along with other charges, in city court. However, Defendant stated his plea in city court resulted in his release from jail in April or May of 2003. This assertion does not advance his case, since his arraignment on the present charge occurred in September 2003.
However, the court summons in this case does not constitute proof that Defendant received actual notice of the dates. Anybody could have scrawled the purported signature that appears on the summons. At the hearing on the motion to quash, there was no attempt to authenticate the signature. The matter of notice was not addressed at all, but the State, Defense counsel, and the trial court appear to have assumed that notice took place. However, as already mentioned, Defendant testified, and denied receiving notice. Therefore, I do not find the record demonstrates that |7Pefendant received actual notice. La. Code Crim.P. art. 579(A)(3) and Romar are not applicable.
*983 Without proof of actual notice, the State labors under the heavy burden of demonstrating that it exercised due diligence in trying to locate Defendant. The State contends it “did in fact seek to extradite the [Defendant from Alabama when he was arrested there.” At the hearing on the motion to quash, the State introduced a copy of a detainer request faxed by the Lafayette Parish Sheriffs Department to the Shelby County Jail. The fax does not identify the state that Shelby County is in, but the fax number includes the 205 area code. The 205 area code does include Birmingham, Alabama, and at the hearing below, Defendant acknowledged going to Birmingham in 2008 after leaving Lafayette, and to having been arrested there. However, the jurisprudence indicates the State’s action did not constitute due diligence in the present context. The Louisiana Supreme Court in State v. Bobo, 03-2362 pp. 7-11, concurrence pp. 1-2 (La.4/30/04), 872 So.2d 1052, 1057-61 (footnotes omitted), explained:
Nevertheless, even assuming that merely by residing at his usual place of abode in Texas, Bobo, because he was “outside the state” when indicted, was a fugitive for purposes of La.C.Cr.P. art. 579(A)(1), it is undisputed that a time came when the State learned of his whereabouts and had within its power the ability to obtain the custody of him. Once the State located Bobo in custody in Texas, it had the affirmative duty to take steps to secure his presence in Louisiana for trial. See [State v.] Amarena, 426 So.2d [613] at 618 [ (La.1983) ] (“Any interruption of the period of limitation which existed under La. C.Cr.P. art. 579(A)(1) ceased when the State learned of the incarceration, location and availability of the defendant, and the two year prescriptive period began to run anew from that time.”); [State v.] Devito, 391 So.2d [813] at 816 [ (La.1980) ] (“After receiving notice of the defendant’s whereabouts [in jail], the State was no longer unable to act in apprehending the defendant or unable to obtain his presence for trial by legal process ... it necessarily follows that any interruption of the period of limitation which existed under Article 579(1) or (2) ceased when the State regained its capacity to act.”).
In fact, the State, fully aware of Bobo’s whereabouts, initiated | sextradition proceedings through the Louisiana Governor’s Office on May 5, 2000. The State contends that because Bobo was incarcerated in Texas, under La.C.Cr.P. art. 579(A)(2), it satisfied its burden of due diligence in attempting to try the accused timely by initiating extradition proceedings and that it therefore had the right to rely on the form letter from the Huntsville prison authorities that it would be informed of Bobo’s release on his Texas sentence.
By its plain terms, Article 579(A)(2) provides a cause of interruption only when the State cannot secure the person by legal process or by other cause beyond its control. The State’s argument that Bobo’s incarceration in Texas impeded its ability to try him timely here seemingly seeks to reprise this court’s holding in State v. Dupree, 256 La. 146, 235 So.2d 408 (1970), overruled, Devito, 391 So.2d at 816. Dupree held that interruption of time limits on trial, which began when the defendant escaped to Mississippi, did not end with his incarceration in that state for another offense and continued until his release from jail on that sentence. However, as the holdings in Amarena, and Devito show, this Court no longer subscribes to its decision in Dupree.
In this case, the prosecuting authority in Ouachita Parish knew or should have *984 known that Texas and Louisiana participate in the Uniform Criminal Extradition Act under which the governor of a participating state, in his or her discretion, may either surrender the accused to the demanding state, or hold the accused until tried and charged, or convicted and punished in the asylum state. See La.C.Cr.P. art. 272, providing:
If a criminal prosecution against the demanded person is pending under the laws of this state, or if he has been convicted in a court of this state but not completely satisfied his sentence, the governor may, in his discretion, surrender him on demand of the executive authority of the other state. The surrender must be pursuant to a re-extradition agreement ...
Cf. Tex.Code Crim. Proc. Art. 51.18, § 19, providing:
If a criminal prosecution instituted against such person under the laws of this State and is still pending, the Governor, in his discretion, either may surrender him on demand of the Executive Authority of another State or hold him until he has been tried and discharged or convicted and punished in this State.
Here, Governor Foster complied with the Uniform Criminal Extradition Act by appending the requisite re-extradition agreement to the State’s extradition demand and, to protect its own interests, the State could not reasonably rely on the form letter sent by the prison authorities at Huntsville as the response of the governing executive authority in Texas |9to Louisiana’s formal demand through its chief executive for the surrender of Bobo. In other words, the State had a duty under Article 579 not only to initiate extradition proceedings in the present case, but also to inform itself of the outcome of the proceedings in the event, as happened, that Texas made the demanded person available to the custody of Louisiana officials. Although Bobo refused to waive extradition after Texas Governor Bush signed the extradition order, by October 12, 2000, when the Texas appellate court affirmed the judgment of the district court ordering his surrender to Louisiana officials, he was no longer beyond the legal processes of the State. Thus, prescription once more began to run against the State on October 12, 2000 when the Texas appellate court affirmed the decision of the district court under the extant extradition warrant issued by the Texas Governor’s Office. This prescriptive period was not thereafter interrupted for more than two years and the arraignment of defendant on December 2, 2002 clearly falls beyond this prescriptive period.
It appears from the record that a breakdown in communication occurred between the Texas and Louisiana authorities when the officials at Huntsville failed to follow the express instructions of the Extradition coordinator in the Governor’s Office and did not notify the Ouachita Parish Sheriffs Office that extradition proceedings had been completed and that Bobo was available for transport to Louisiana although he was still serving his sentence in Texas. Nevertheless, the fact remains that by failing to make any inquiries regarding the extradition proceedings, the State neglected to take reasonable steps to apprise itself that any cause of interruption as a matter of Article 579(A)(1) or (2) had ceased to exist as of October 12, 2000, and that the two-year period for bringing Bobo to trial in Louisiana for his alleged crimes had begun to run anew from that date. The State’s attempt to rely on the form letter sent by the officials at Huntsville, which makes *985 no reference to the extradition proceedings, as an interruption of prescription under Article 579(A)(1) or (2) is unavailing when in the face of a properly executed warrant of extradition signed by the Texas Governor, a final judgment by the Texas courts on the issue, and this court’s overruling of Dwpree and its progeny. Furthermore, problems encountered by the State in extradition or those caused by its own mismanagement cannot be charged to the defendant. Devito, 391 So.2d at 816. As a consequence, the State allowed its prosecution to prescribe while Bobo finished serving his sentence in Texas.
Additionally, this matter is distinguishable from the case in [State v.] Beverly [448 So.2d 792 (La.App. 2 Cir. 1984) ] upon which the State and the lower courts rely. In Beverly, it appeared that the California authorities had declined to extradite defendant until the completion of his sentence. 448 So.2d at 793. In this case, when Governor Bush signed the extradition warrant, Texas made Bobo available to Louisiana although he had not yet finished serving his sentence in the penitentiary at Huntsville.
| ^Therefore, the trial court erred in denying Bobo’s motion to quash the present prosecution filed approximately two months after the period of limitation expired. Although Bobo has shown no prejudice as the result of his continued incarceration on his underlying sentence in Texas for two years after the appellate courts of that state sanctioned his surrender to Louisiana, statutory periods of limitation on the prosecution of eases offer the primary means of enforcing the Sixth Amendment right to a speedy trial “beyond which there is an irrebuttable presumption that a defendant’s right to a fair trial would be prejudiced.” United States v. Marion, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).
CONCLUSION
Thus, the State’s failure to bring Bobo to trial within two years from the date of his indictment was not because his presence could not be obtained by legal process nor due to events beyond its control. Accordingly, we hold that the State has not met its burden of proving that an interruption of the prescriptive period contained in La.C.Cr.P. art. 578 has occurred.
DECREE
For the foregoing reasons, the judgment of the trial court is therefore reversed, the motion to quash is ordered granted, and defendant is discharged from custody on the present charges.
REVERSED.
[[Image here]]
WEIMER, J., additionally concurs with reasons.
[[Image here]]